**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARCY E. YOUNG, | ) | CASE NO. 1:23-CV-01435-JG |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | JAMES S. GWIN |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff, Marcy E. Young ("Ms. Young"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (ECF non-document entry dated July 25, 2023.) For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.    PROCEDURAL HISTORY

On July 1, 2019, Ms. Young filed an application for DIB, alleging a disability onset date of August 1, 2018. (Tr. 196-97.)[2] Her application related to mitochondrial disorder/chronic progressive external ophthalmoplegia, facet joint arthritis, degenerative disc disease of the lumbar spine; anxiety; and disorders of the muscle, ligament, and fascia. (Tr. 19, 274.) Her application

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
[2] The administrative transcript ("Tr.") appears at ECF No. 4 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record references are to the electronically stamped CM/ECF document ("ECF No.") and PageID# rather than any internal pagination.

was denied initially and upon reconsideration. (Tr. 107-11, 113-17.) An administrative law judge ("ALJ") held an administrative hearing on September 20, 2022. (Tr. 44-85.) Ms. Young, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) The ALJ issued a written decision on October 17, 2022, finding Ms. Young was not disabled within the meaning of the Social Security Act. (Tr. 17-37.) The Commissioner's decision became final on May 26, 2023, when the Appeals Council declined further review. (Tr. 1-6.) Ms. Young filed a complaint on July 25, 2023. (ECF No. 1.) She asserts the following assignments of error:

(1) The ALJ erred at Step Two of the Sequential Evaluation when she failed to properly consider the totality of Plaintiff's impairments when forming the RFC.

(2) The ALJ erred and her decision was not supported by substantial evidence when she failed to properly evaluate the opinions of the treating sources in accordance with 20 CFR 404.1520c.

(3) The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p.

(ECF No. 5, PageID#1202.)

### III.    BACKGROUND

#### A.    Personal, Educational, and Vocational Information

Ms. Young was born in in 1984, and she was 34 years old on the alleged disability onset date. (Tr. 35.) She is married and has two children. (Tr. 50.) She graduated from college with a bachelor's degree in journalism. (Tr. 51.) She also has a certificate in sales training (*Id.*) She has a driver's license with no restrictions. (*Id.*) Her past relevant work was employment as a radio and television time sales representative and director. (Tr. 35.)

### B. Relevant Non-Medical/Medical Opinion Evidence

#### 1. *Adam Hedaya, M.D.*

On December 4, 2019, Dr. Hedaya completed a letter on Ms. Young's behalf. (Tr. 565.) He noted that Ms. Young had been his patient "for the last several months" and that he had been treating her for back pain "which is likely affected by her underlying [m]itochondrial disorder." (*Id.*) Dr. Hedaya described three "debilitating episodes of back pain," experienced by Ms. Young, two of which occurred while she was a patient of Dr. Hedaya. (*Id.*) He stated that Ms. Young's musculoskeletal issues appear to be "ongoing, chronic, and episodic." (*Id.*) He reported that Ms. Young's pain and condition is "impacted by the rigors and demands of her current position of employment." (*Id.*)

#### 2. *Mackenzie Varkula, D.O.*

On July 20, 2018, Dr. Varkula completed a letter discussing Ms. Young's symptoms and treatment for chronic progressive external opthalmoplegia ("CPEO")[3] since May 3, 2017. (Tr. 313-14.) Dr. Varkula reported that a conversation with Dr. Sumit Parkih, Ms. Young's neurologist, "led to the mutual agreement that [her] fatigue cannot be fully explained by her genetic illness." (Tr. 313.) Dr. Vakula also reported that Ms. Young's anxiety symptoms "had been impairing her overall daily functioning" and noted that Dr. Parikh had been "encouraging her to more aggressively manage it again." (*Id.*) Dr. Varkula reported that she had been "continually urg[ing] Ms. Young to enter psychotherapy," but Ms. Young "struggles with finding the time to dedicate to this process." (Tr. 314.)

---

[3] CPEO is a type of eye disorder that is typically associated with pathogenic mitochondrial DNA deletion mutation, which is characterized by slowly progressive weakening of the ocular muscles. *Chronic Progressive External Ophthalmoplegia (CPEO)*, Stedman's Medical Dictionary 629860 (Nov. 2014); *Mitochondrial DNA Detection Disorder*, Stedman's Medical Dictionary 260250 (Nov. 2014).

### 3. *Sumit Parikh, M.D.*

On July 23, 2018, Dr. Parikh completed a letter describing Ms. Young's symptoms of a primary mitochondrial disease. (Tr. 315.) He stated that Ms. Young experiences severe fatigue due to her mitochondrial disease and that her symptoms "will unfortunately worsen over time as she has a progressive condition." (*Id.*)

On February 14, 2020, upon request and with input from Ms. Young (Tr. 855-56), Dr. Parikh completed a letter on Ms. Young's behalf. (Tr. 850.) Dr. Parikh indicated that Ms. Young was receiving neurologic treatment from him for a primary genetic mitochondrial disorder due to a TWINKLE gene[4] mutation. (*Id.*) He discussed the symptoms related with this condition, which includes drooping eye lids, progressive muscle weakness, eventual inability to ambulate without assistance or need of a wheelchair, and severe fatigue. (Tr. 850.) He noted that, as of a September 2020 office visit, Ms. Young continued to have issues with fatigue, muscle weakness, and back pain attributable to her progressive disease. (*Id.*) He also noted that Ms. Young's energy levels continue to fluctuate, and she experiences more fatigue. (*Id.*) He noted that Ms. Young has had intermittent vertigo without a trigger starting in Fall 2019, for which she is treated by a specialist and has had vestibular and audiology testing. (*Id.*) Dr. Parikh opined that "[d]ue to [her] disease [,] any exertion such as standing, driving and traveling exacerbate her symptoms of weakness, as well as her vertigo concerns." (*Id.*) Dr. Parikh also noted that over time it will be unsafe for Ms. Young to drive long distances or in dim light due to her vision impairment. (*Id.*) Dr. Parikh noted that Ms. Young continued to:

---

[4] The TWNK gene, also called the TWINKLE gene, provides instructions for making the Twinkle protein. *TWNK Gene*, MEDLINE PLUS, https://medlineplus.gov/genetics/gene/twnk/ (last visited May 30, 2024). The Twinkle protein is a protein of the mitochondria, which are structures in which a process called oxidative phosphorylation occurs to convert energy from food into a form that cells can use. *Id.* The Twinkle protein is involved in the production and maintenance of mitochondrial DNA. *Id.*

experience ongoing symptoms that impact her daily activities as described above. These ongoing symptoms prevent [Ms. Young] from working in any meaningful capacity. Based on the above, we expect that [Ms. Young] will have difficulty in maintaining employment in general. With her progressive disease, the amount of driving, standing, and traveling causes extreme fatigue due to the level of physical demand. The act of simply standing for 10 minutes causes discomfort in her lower back, sacrum, and hips. Therefore, I feel it is important for her to have the opportunity to benefit from Long Term Disability.

(*Id.*)

### 4. *Marie Schaefer, M.D.*

On August 3, 2018, Dr. Schaefer – Ms. Young's primary care physician since October 24, 2026 – drafted a letter on behalf of Ms. Young. (Tr. 317-18.) Dr. Schaefer stated that Ms. Young's physical deficits "make it difficult for her to perform her job" and that she will "continue to have difficulty performing at the level required for her job." (Tr. 317.) Dr. Schaefer stated that "[it] would be in [Ms. Young's] best interest to pursue long-term disability." (Tr. 318.)

### 5. *Leon Anderson, III, PT*

On August 3, 2018, Mr. Anderson – Ms. Young's physical therapist since November 2016 – drafted a letter "in support of [Ms. Young's] application for disability." (Tr. 320.) He noted that prolonged sitting or standing "can exacerbate [Ms. Young's] conditions due to muscle fatigue, adversely affecting physiological joint motion." (*Id.*) He also noted that "[a] high stress environment can compound the [e]ffects of muscle fatigue during such activities." (*Id.*)

### 6. *Bina Mehta, M.D.*

During a February 27, 2019, examination, Dr. Mehta observed that Ms. Young had decreased range of motion, tenderness, bony tenderness, and pain in her lumbar spine; mild weakness of the bilateral gluteal medius; some winging of the left scapular areas; L3-L5 bilateral facet tenderness; and some increased pain with exertion. (Tr. 361.) Dr. Mehta noted that a 2016 MRI showed fairly significant degenerative disease at the L5 level with significant facet

arthropathy at L4 and l5, but that a 2018 MRI "did not show anything significant." (Tr. 361-62.) Dr. Mehta recommended medical branch blocks from L3-L4 to L5/S1 and consideration of radiofrequency ablation. (Tr. 362.)

On March 5, 2019, Dr. Mehta drafted a letter on Ms. Young's behalf. (Tr. 370-71.) Dr. Mehta described Ms. Young's treatment history and symptoms. (*See id.*) Dr. Mehta stated that Ms. Young  "desperately" wanted to work but "the fact that she cannot drive for more than 20 minutes without severe pain and the long hours required for marketing in her job make it impossible for her to return to her position of employment due to her fatigue that is worse when her pain flares." (Tr. 371.) Dr. Mehta thus opined that Ms. Young "definitely qualifies for long-term disability." (*Id.*)

### 7.  *Laura Lipold, M.D.*

On November 22, 2021, Dr. Lipold wrote a letter on Ms. Young's behalf. (Tr. 649-50.) Dr. Lipold indicated that Ms. Young last saw her on November 17, 2021. (Tr. 649.) Dr. Lipold stated that Ms. Young had a primary genetic mitochondrial disorder due to a TWINKLE gene mutation, causing CPEO, retinal disease, myopathy, and neuropathy. (*Id.*) Dr. Lipold reported that, as of her last office visit on November 17, 2021, Ms. Young "continues to experience daily symptoms of fatigue, shortness of breath and myalgias[5] that are exacerbated by any prolonged sitting, prolonged standing, prolonged walking, stair climbing, and driving." (*Id.*) Dr. Lipold stated that if Ms. Young needed to travel, Ms. Young needed to do so by car with another person driving so she can take frequent breaks. (*Id.*) Dr. Lipold also noted that Ms. Young is unable to travel by other means. (*Id.*) Dr. Lipold further stated that Ms. Young was recently diagnosed with vestibular dysfunction

---

[5] Myalgia describes muscle aches and pain, which can involve ligaments, tendons, and fascia (the soft tissues that connect muscles, bones, and organs). *Myalgia*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/myalgia (last visited June 3, 2024). Myalgia can be the result of injuries, trauma, overuse, tension, certain drugs, and illnesses. *Id.*

and impaired hearing "which further compounds her symptoms." (*Id.*) Dr. Lipold noted Ms. Young

has heat intolerance and impaired vision due to her ptosis. (*Id.*) Finally, Dr. Lipold opined the

following:

> Despite medical treatment, rest and time away from work, [Ms. Young] continues
> to experience ongoing symptoms that impact her daily activities as described above
> and prevents her from engaging in work of any meaningful capacity and given the
> progressive nature of her illness, will unlikely be able to do so in the future.

(*Id.*)

### 8.  *Functional Capacity Evaluations*

On March 27, 2019, Ms. Young attended a functional capacity evaluation ("FCE") with

Ohio Diagnostic Services. (Tr. 722-33.) Ms. Young demonstrated the ability to push and pull at

light demand level; lift, carry, and perform overall strength tasks in the sedentary demand level;

constantly sit and crouch; frequently finger; and occasionally stand, walk, balance, bend, kneel,

reach, handle, and climb stairs. (Tr. 722.) Amy Smith, OTR/L, CEAS, CWE, opined that Ms.

Young had no functional limitations. (*Id.*) Ms. Smith, however, also stated: "[T]he impact of the

reported fatigue and resulting disabling pain was not elicited with the exam. This does not discount

that the symptomology exists, just that it was not noted during this exam." (*Id.*)

On September 16, 2020, Ms. Young attended a second FCE. (Tr. 734-47.) Ms. Smith wrote:

> Ms. Young demonstrates good range of motion in all extremities, but has weakness
> and resulting symptomology, especially core strength weakness that impacts
> function in all 4 extremities. Subsequently, tasks that require strength and/or
> sustained postures are adversely affected. It should be noted that Ms. Young
> provided exceptional effort throughout the evaluation. Still, she demonstrates
> significant and pervasive functional limitations for all components of work
> including positional tolerance, (i.e. sitting, standing), mobility (i.e. walking, stair
> climbing, bending, crouching and kneeling), and material handling ability (i.e.
> lifting, carrying). Additionally, the fatigue component of the disease impacts all
> performance and greatly reduces any repetition of task, even for low repetition and
> for sustained postures required for standing, holding a phone to her head and
> visually affecting the eyes reducing ability to complete computer-based work.
> Overall, she demonstrates SEDENTARY work capacity on a part time basis given

that her limitations do not allow her to be able to sustain the demands of a reasonably reliable employee.

(Tr. 734.)

### 9. *State Agency Opinions*

On January 15, 2020, David Knierim, M.D., reviewed the medical record at the initial level of consideration. Dr. Knierim opined that Ms. Young could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk for 4 hours and sit for about 6 hours during an 8-hour workday with normal breaks; could occasionally stoop; could never climb ladders, ropes, or scaffolds; and needed to avoid all exposure to hazards. (Tr. 87-94.) Gary Hinzman, M.D., affirmed those findings on May 11, 2020. (Tr. 96-103.)

Irma Johnston, Psy.D., reviewed the psychological evidence at the initial level of consideration on January 10, 2020. Dr. Johnston opined that Ms. Young's mental impairments were non-severe and assessed no mental RFC limitations. (Tr. 87-94.) Bonnie Katz, Ph.D., affirmed those findings on May 11, 2020. (Tr. 96-103.)

### C. **Relevant Medical Evidence**

### 1. *Psychiatric Impairments*

On January 10, 2019, Ms. Young presented to Mackenzie Varkula, D.O., for psychiatric care. (Tr. 381-86.) Ms. Young reported she had constant dreams that her legs were not working and that it was the day of her mother's death, and she further stated she was "haunted by the lurking nature of the disease." (*Id.*) Ms. Young also stated that her medication was helpful, but she required more of it. (Tr. 381.) Ms. Young was slightly distractible during the interview, described her mood as "edgy," and was intermittently tearful; however, she was well-groomed, behaved appropriately, and was alert. (Tr. 384.) DR. Varkula noted that Ms. Young had a good prognosis. (*Id.*)

8

On October 3, 2019, Ms. Young again met with Dr. Varkula. (Tr. 374-79.) The mental status examination notes were fairly unremarkable. (*See* Tr. 377-78.) Significantly, Ms. Young was well-dressed and well-groomed; behaved appropriately during the encounter; had stable and appropriate affect; and demonstrated appropriate concentration, judgment, and insight. (*Id.*)  Dr. Varkula wrote that Ms. Young had been taking sertraline since May 2017 without problems and had a good prognosis. (Tr. 379.)

On October 30, 2019, Ms. Young began counseling on a regular basis, which continued through August 18, 2022. (Tr. 704-21.) The mental status examination notes from October 30, 2019, described Ms. Young as well-groomed with appropriate affect and cooperative but sad. (Tr. 704.) At a November 2, 2019, counseling appointment, Ms. Young was well-groomed and cooperative with appropriate affect. (Tr. 705.) Ten days later, Ms. Young was sad, but she was well-groomed, cooperative, and fully oriented with appropriate affect. (Tr. 706.) On December 4, 2019, Ms. Young's mental status examination findings remained the same. (Tr. 707.)

On January 8, 2020, Ms. Young attended a chiropractic appointment with complaints of dull, aching pain in her left pelvis and low back. (Tr. 583.) She reported that she went on a cruise over the holiday season and developed some pain in her left lower back and hip by the end of the trip. (*Id.*) A week later, the mental status examination results from Ms. Young's counseling appointment indicated that she was frustrated but well-groomed, cooperative, and fully oriented with appropriate affect. (Tr. 708.) At a February 13, 2020, follow-up appointment regarding her mitochondrial disorder, Ms. Young reported fluctuating energy levels and said she felt more fatigue after stopping a research drug, but she also reported exercising regularly. (Tr. 606.) She had normal gait and no ataxia. (Tr. 607.)

On May 12, 2020, Ms. Young met with Dr. Varkula for therapy. Dr. Varkula observed that Ms. Young had a "mild" impairment of social, occupational, or school functioning. (Tr. 673.) Ms. Young described her mood as "stressed," but her mental status examination notes were otherwise unremarkable. (Tr. 671-72.) She was well-dressed and groomed and behaved appropriately. (Tr. 671.) She had a stable and appropriate affect and demonstrated appropriate concentration. (Tr. 671-72.)

On August 27, 2020, Ms. Young reported to Dr. Varkula that she was obsessed with puzzles and was working her "tail off" keeping her children feeling engaged. (Tr. 675.) She also reported being unable to cry due to her sertraline, but she was uncertain about changing her medication because she was not sure she would feel better. (Tr. 676.) The "Review of Symptoms" sections indicated that Ms. Young reported she was working on excessive and inappropriate guilt, a significant lowering of self-esteem or self-efficacy, and ongoing difficulty with fatigue and feeling like she does not have enough energy. (*Id.*) Dr. Varkula wrote that the severity and functional impact of Ms. Young's symptoms have been mild. (Tr. 676.) Ms. Young described her mood as "exhausted," but her mental status examination results remained the same from her May 2020 appointment. (Tr. 679.)

On January 5, 2021, Ms. Young attended a physical therapy appointment. She reported driving to Florida for the holiday season, resulting in increased stiffness in her lower back. (Tr. 937.) She also reported that she fell on ice on December 31, 2020, which aggravated her lower backs, ribs, and cervical region, but she reported improvement each day since the fall. (*Id.*) At a physical therapy appointment on February 17, 2021, Ms. Young reported she went on a skiing trip the previous weekend and did not experience any pain in her lower back. (Tr. 927.) On March 18, 2021, Ms. Young told her physical therapist that she was continuing to feel "better overall" and

10

had no new complaints. (Tr. 925.) She also reported that she was planning on driving to Florida for vacation. (*Id.*)

On April 22, 2021, Ms. Young attended a virtual appointment with Dr. Varkula for her anxiety and mood symptoms. (Tr. 682.) Since her last visit on August 27, 2020, Ms. Young had purchased a new house. (*Id.*) Ms. Young reported she was "able to do everything she wants to do." (Tr. 683.) Ms. Young described her mood as "numb," but her mental status examination results were otherwise normal. (Tr. 685-86.)

On September 24, 2021, Ms. Young attended a telehealth psychiatric appointment with Dr. Varkula. The treatment notes indicate that Ms. Young's Zoloft dosage was decreased because of "emotional numbing" and that she was feeling more "proper emotion" since the dosage reduction. (Tr. 689-90.) Ms. Young had appropriately tearful affect and demonstrated some anticipatory anxiety about the holidays but described her mood as "better – feeling again." (Tr. 693.) Her mental status examination results were otherwise normal. (Tr. 692-93.)

At a February 21, 2022, counseling session, Ms. Young reported that she was writing a book. (Tr. 718.) Her mental status examination revealed she was sad but was well-groomed, cooperative, and fully oriented with appropriate affect. (*Id.*)

On April 8, 2022, Ms. Young attended a telehealth psychiatric appointment with Dr. Varkula. She reported that she was feeling disheartened and frustrated due to her long-term disability benefits being cut off. (Tr. 697.) She reported that she began experiencing panic attacks again. (*Id.*) She reported she was "go[ing] out for a girls night" but was nervous that she might have a panic attack. (*Id.*) Dr. Varkula observed that the severity and functional impact of Ms. Young's presenting symptoms was mild. (*Id.*) Ms. Young described her mood as "eh" and

11

demonstrated anxiety about panic attacks, but her mental status examination results were otherwise normal. (Tr. 700-01.)

## 2. *Physical Impairments*

On October 24, 2018, Ms. Young met with Adam J. Hedaya, M.D. Dr. Hedaya observed that Ms. Young had tenderness to palpation over the lumbar sacral spine. (Tr. 333.) The physical examination revealed that Ms. Young had normal gait and motor strength. (*Id.*) She had normal mood affect and was alert. (*Id.*)

A July 19, 2018, MRI of Ms. Young's lumbar spine showed mild and moderate degenerative changes. (Tr. 353.) She had straightening of the lumbar lordotic curve that could have indicated lumbar muscular spasm. (*Id.*) An earlier November 3, 2018, MRI revealed an L5-S1 disc protrusion traversing the S1 nerve roots. (Tr. 349.)

On November 30, 2018, Ms. Young met with Dr. Hedaya. Dr. Hedaya observed that Ms. Young had severe tenderness to palpation over the lumbar sacral spine, but no tenderness over the spinous process. (Tr. 328.) Dr. Hedaya wrote in associated symptoms that Ms. Young had no shortness of breath, weak limbs, or gait instability. (*Id.*) Ms. Young demonstrated normal gait, station, and tone and motor strength. (Tr. 329.) The treatment notes also indicate that Ms. Young received 70 percent pain relief from injections. (*Id.*) Dr. Hedaya wrote that Ms. Young was not a surgical candidate and had a "few painful days occasionally but overall doing much better." (*Id.*)

On February 27, 2019, Ms. Young presented to Bina Mehta, M.D. for lumbar pain. (Tr. 358.) Ms. Young's spine had decreased range of motion, tenderness, and bony tenderness. (Tr. 361.) She had normal gait including normal heel and toe walk. (*Id.*) She had normal motor skills, normal sensation, normal strength, and normal reflexes. (*Id.*) She displayed no weakness and no atrophy and exhibited normal muscle tone. (*Id.*) She was alert and oriented to person, place, and

time. (*Id.*) Dr. Mehta observed that her 2018 lumbar MRI "did not show anything significant." (Tr. 362.) Dr. Mehta continued Ms. Young's conservative treatment and scheduled her for bilateral medial branch blocks. (*Id.*)

At an October 3, 2019, psychiatric appointment, Ms. Young demonstrated normal gait. (Tr. 378.) Treatment notes from November 18, 2019, reflect that Ms. Young was diagnosed with vertigo over the phone. (Tr. 619.) She was prescribed medications for this condition, but she admitted she only took the medication on one occasion because she was advised not to drive on it. (*Id.*) She also indicated that the dizziness only occurred in the mornings and resolved within 20 minutes. (*Id.*) She was planning on going on a cruise in the next five weeks so she wanted to "get to the bottom of this" and wondered if "other causes of vertigo should be ruled out due to underlying disease." (*Id.*) Bithermal caloric testing on December 12, 2019, yielded significant weakness on the right side. (Tr. 639.)

Treatment notes from February 12, 2020, indicated that Ms. Young had a "mild" lateral gaze restriction with more vertical restriction of motility. (Tr. 608.) She had a slight chin up position. (*Id.*) Ms. Young met with Dr. Parikh on February 13, 2020. Dr. Parikh indicated that he last saw Ms. Young nine months ago. (Tr. 603.) Dr. Parikh wrote that Ms. Young completed a study related to her mitochondrial disorder and believed the medication helped her. (Tr. 606.) Dr. Parikh also noted that Ms. Young's vertigo symptoms had generally resolved. (*Id.*) Ms. Young further reported that her mental health symptoms were stable. (*Id.*) Regarding Ms. Young's fatigue, Dr. Parikh wrote that Ms. Young exercises regularly but had less energy after a study for a research drug for her mitochondrial disorder (*Id.*) Ms. Young had normal gait and was alert and interactive. (Tr. 607.)

13

Ms. Young attended a virtual visit with Dr. Parikh on September 2, 2020. Regarding fatigue, Dr. Parikh wrote that Ms. Young exercised regularly but reported fluctuating energy levels. (Tr. 863.) The "observational" exam described Ms. Young as "alert" and as having normal gait. (Tr. 864.) Regarding coordination, Ms. Young had no nystagmus or tremor. (*Id.*) Her movements were non-ataxic without dysmetria. (*Id.*)

On September 30, 2020, Ms. Young attended an appointment with Laura Lipold, M.D. Ms. Young reported that she had daily fatigue that "seem[ed] to be getting worse over time" and recent vertigo. (Tr. 840.) The physical examination results were unremarkable, including a normal examination of the extremities and no pain to palpation in the back. (Tr. 843.) Dr. Lipold wrote that Ms. Young was managing with physical therapy, dry needling, and intakes of diclofenac as needed. (Tr. 844.)

On November 18, 2020, Ms. Young underwent an evaluation regarding disorders of hearing, tinnitus, or balance. (*See* Tr. 637.) Ms. Young reported that she had experienced balance problems her entire life and increased dizziness for a few weeks in November 2019, which had since resolved. (*Id.*) The testing results suggested a bilateral vestibulo-ocular reflex impairment. (*Id.*)

On April 21, 2021, Ms. Young reported that she was ready to take a break from physical therapy to see how she does on her own. (Tr. 985.) At this point, she had completed 20 physical therapy visits and was noted as improving. (*Id.*) On May 27, 2021, Ms. Young reported that she was having increased discomfort and stiffness in her lower back. (Tr. 919.) She reported that she was hosting a party that weekend and was worried she would not be able to tolerate the increased activity. (*Id.*)

14

Ms. Young reported on February 23, 2022, that she experienced less fatigue with standing and walking activities like cooking in the kitchen or walking around the store shopping. (Tr. 1009.) On February 28, 2022, Ms. Young reported having significant improvements overall since beginning Neubie treatment. (Tr. 1007.) She indicated that she had noticed she could work out a little harder and tolerate activities of daily living with less difficulty. (*Id.*) At a March 11, 2022, appointment, she reported that she felt really good and was able to stand and cook in the kitchen for extended periods of time without adverse reactions. (Tr. 1001.) Treatment notes from April 4, 2022, showed that Ms. Young reported she was continuing to improve overall but had moderate soreness and discomfort in the right side of the lower lumbar following the last visit, possibly due to added resistance exercises. (Tr. 993.)

### D. Relevant Hearing Testimony

#### 1. *Ms. Young's Testimony*

Ms. Young testified that she is unable to work due to her mitochondrial disorder, CPEO. (Tr. 57.) She stated that it is a progressive disease, and she is beginning to experience issues stemming from that disorder. (Tr. 57-58.) The primary issue she experiences is intense fatigue. (Tr. 58.) She describes it as feeling like she is on "10% of [her] battery life" and "always want[ing] to go to bed." (*Id.*) She reported anxiety in the evenings about "getting through the evening and being able to get to bed on time" and this sometimes results in panic attacks. (*Id.*) She reported that another issue in relation to her fatigue is that her trunk feels weak. (*Id.*) She testified that just standing for a few minutes for tasks such as meal prep and laundry results in her needing to rest. (*See id.*)

Ms. Young also testified that she has issues with driving for extended periods of time, but she can drive short distances. (Tr. 51, 58-59.) She also testified that she has a vestibulo-ocular

impairment that results in dizziness. (Tr. 59.) She stated that she cannot balance and walks into door frames and corners of her kitchen. (*Id.*) She further testified that her back restricts her socially. (Tr. 59-60.) She reported that she is "really freaked out" because several family members have died from her rare condition. (Tr. 60.)

Ms. Young testified that she was taking part in a drug trial that was time consuming, including full-time appointments, fasting, participating in interviews, and making videos. (Tr. 60-61.) She testified that her all-day visits were now monthly or every other month. (Tr. 62.) She thought that she was in the placebo group for this drug trial. (*Id.*) She testified that she also completed physical therapy and did some exercise. (Tr. 63.) She clarified that exercising meant short walks, swimming, or 15-minute indoor bike rides. (*Id.*) Ms. Young also indicated that her eye "drooped." (Tr. 65.) She indicated that her eye was getting worse, and she was getting close to needing eyelid surgery. (*Id.*) She also endorsed a heat intolerance. (Tr. 67.)

Regarding activities of daily living, Ms. Young testified that she drove short distances but also testified that she could only be a passenger in a car. (Tr. 51, 58-59.) She volunteered for two different boards, but she clarified that this service only entailed attending quarterly online meetings or making phone calls. (Tr. 52.) She denied that she got much done in a normal day. (Tr. 66.) She indicated that she used services such as curbside pick-up because she has problems standing in line. (*Id.*) She testified that she could wash but could not carry laundry. (*Id.*) She cooks dinner infrequently, but when she does so she is able to chop vegetables in increments throughout the day. (*Id.*) She is able to wash herself, but the process takes longer than the average person and she must rest afterward. (*Id.*) She does not clean up around the house or do yardwork. (Tr. 67.) On a typical day, Ms. Young testified that she tries to do a quick workout; rests; bathes; takes care of activities such as emailing her child's teacher; and runs errands like going to the bank or picking

up items. (Tr. 68-69.) She indicated that she drives her children to after-school activities such as soccer or basketball. (Tr. 69.)

## 2. *Vocational Expert's Testimony*

The ALJ opined that Ms. Young's past relevant work was employment as a radio and television time sales representative and director. (Tr. 80.) The ALJ asked the VE whether an individual with Ms. Young's age, education, and work experience could perform work at the sedentary exertional level except that she can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and walk for 4 hours of an 8-hour workday; frequently push and pull with the left, lower extremity; never climb ladders, ropes, and scaffolds; occasionally stoop; and never have exposure to hazards such as unprotected heights, dangerous machinery, and commercial driving. (Tr. 81.) The VE opined that this individual could not perform her past relevant work but could perform other work as a telephone order clerk, document preparer, and final assembler. (Tr. 81-82.) The VE opined that an employer would tolerate no more than eight unscheduled absences during a year. (Tr. 82.)

Ms. Young's counsel asked whether the individual from the first hypothetical could still perform work if additionally limited to only occasionally handling, fingering, and feeling. (Tr. 83.) The VE opined that this limitation would eliminate the opined jobs and eliminate any sedentary, unskilled competitive work. (*Id.*) Ms. Young's counsel then asked whether the individual could perform work if the employee required flexibility in scheduling breaks up to a third of the time. (Tr. 83.) The VE opined that this would require an accommodation that would not be consistent with competitive work. (*Id.*) Ms. Young's counsel finally asked the VE whether the individual could perform work if she required flexibility from her employer to work outside of the expected

pace or production. (*Id.*) The VE opined that this would require an accommodation that is not consistent with competitive work. (*Id.*)

## IV.     ALJ'S DECISION

The ALJ first found that Ms. Young meets the insured status requirements of the Social Security Act through December 31, 2024. (Tr. 19.) The ALJ then found that Ms. Young has not engaged in substantial gainful activity since August 1, 2018, the alleged disability onset date. (*Id.*) The ALJ further found that Ms. Young has the following severe impairments: degenerative disc disease of the lumbar spine; diffuse diseases of connective tissue (mitochondrial disorder/CPEO); and disorders of the muscle, ligament, and fascia. (Tr. 19-23.) However, the ALJ determined that none of Ms. Young's impairments—either individually or in combination—met or medically equaled the severity of a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 23-24.)

The ALJ determined that Ms. Young retained the residual functional capacity ("RFC") to perform work at the sedentary exertional level except she can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; can stand and walk for 4 hours out of an 8-hour workday; can frequently push and pull with the left, lower extremity; can never climb ladders, ropes, and scaffolds; can occasionally stoop; and can never have exposure to hazards such as unprotected heights, dangerous machinery, and commercial driving. (Tr. 24-35.) The ALJ found that Ms. Young is unable to perform her past relevant work as a radio and television time sales representative or director. (Tr. 35.)

The ALJ then found that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Young is not disabled within the meaning of the Social Security Act. (*Id.*) The ALJ determined that, considering Ms. Young's age, education, work experience, and RFC, there are jobs that exist

in significant numbers in the national economy that Ms. Young can perform such as a telephone order clerk, document preparer, and final assembler. (Tr 35-36.) Accordingly, the ALJ concluded that Ms. Young has not been under a disability, as defined in the Social Security Act, from August 1, 2018, through the date of the ALJ's decision. (Tr. 36.)

## V.    LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

## B. <u>Standard for Disability</u>

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Sbpt. P, App. 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step

Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

> ### C. **Analysis**
>
> **1. *Substantial evidence supports that Ms. Young's mental impairments were non-severe and the ALJ appropriately considered the non-severe impairments later in the sequential evaluation process.***

Ms. Young argues that the ALJ erred by finding her mental impairments non-severe and by not including any limitation in the RFC to account for those non-severe mental impairments. (ECF No. 5, PageID#1211-14.) The Commissioner disagrees. (ECF No. 6, PageID#1239-42.) For the following reasons, this assignment of error lacks merit.

At Step Two of the sequential evaluation process, an ALJ must determine with a claimant's medically determinable impairment is a "severe" impairment. See 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers*, 486 F.3d at 243 n.2 (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988)). When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent Steps in the sequential evaluation process, any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987).

Prior to determining whether a claimant can perform her past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your

[RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

Ms. Young argues that the ALJ erred at Step Two when the ALJ did not find her impairments of anxiety; obsessive compulsive disorders; and depressive, bipolar, and related disorders were severe impairment (Tr. 19). This argument lacks merit. Here, the ALJ found that Ms. Young's medically determinable mental impairments were non-severe. (Tr. 20-23.) Ms. Young primarily appears to focus on the fact that the ALJ's cited evidence were not "related to her depression and/or anxiety." (ECF No. 5, PageID#1212.) She then proceeds to cite her subjective reports to her providers and statements from Dr. Varkula's letters on her behalf regarding her mental health symptoms as support for the conclusion that her condition is not severe. (*See id.* at PageID#1212-13.) Yet, Ms. Young fails to establish how this evidence warrants finding that her impairments significantly limit her mental ability to do basic work activities, or that they are anything more than slight abnormalities that minimally affect her work ability. 20 C.F.R. § 404.1520(c)

Here, the ALJ explained his reasoning for determining that these impairments are non-severe and cited the relevant portions of the record upon which he relied. For example, the ALJ discussed how Ms. Young's daily activities demonstrated that she was "fairly active and functional," pointing to reported activities such as driving to Florida for vacation, writing a book, going on a cruise, going out for a girl's night, exercising regularly, hosting a party, and working

her "tail off" to keep her children engaged. (Tr. 20.) Ms. Young appears to dispute the ALJ's discussion and reliance on these activities in the ALJ's assessment of the severity of Ms. Young's mental impairments because these statements were made at physical therapy appointments.  But she does not dispute that she did report engaging in these activities.

Further, the ALJ's decision was not solely premised on these reports. Indeed, the ALJ explicitly addressed Ms. Young's relevant mental health treatment notes from her visits with Dr. Varkula. (Tr. 20-21.) Notably, as the ALJ stated, the mental health treatment record "showed [that Ms. Young] had fairly unremarkable mental status notes with treatment." (Tr. 20.) Indeed, despite described moods of sadness and stress, her mental status examination results reflect that she was well-groomed; had appropriate affect and cooperative behavior; and appropriate concentration. (*See, e.g.*, Tr. 377-78, 671-72, 704-07.) The ALJ also observed that Dr. Varkula noted in September 2021 that the severity and functional impact of Ms. Young's presenting symptoms was mild. (Tr. 697.)

The ALJ then addressed the Paragraph B criteria and determined that Ms. Young has no more than mild limitations in the four broad functional areas. (Tr. 21-22.) This analysis included discussion of Ms. Young's function report, treatment notes from providers, and hearing testimony. Specifically, the ALJ stated the following:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has mild limitation. The claimant did not make specific allegations in this area but endorsed fatigue. The claimant testified that she has a bachelor's degree, and the claimant has a history of skilled work. The claimant testified that she volunteered for two local boards by attending online meetings. Treatment notes consistently and across providers indicated that the claimant was alert (10/24/2018, Exhibit 6F, page 13; 11/30/2018, Exhibit 6F, page 9; 1/10/2019, Exhibit 11F, page 13; 2/27/2019, Exhibit 8F, page 6; 2/13/2020, Exhibit 16F, page 17; 9/2/2020, Exhibit 27F, page 117). Treatment notes from February 21, 2022, showed that the claimant was writing a book (Exhibit 24F, page 15). The claimant indicated in her function report that her hobbies were reading, writing, watching sports, and going to movies (Exhibit 4E). The claimant indicated that she could

manage money such as paying bills. The claimant indicated that she could follow directions "fine." The claimant did not mark that she had difficulties with memory, completing tasks, understanding, or following directions.

The next functional area is interacting with others. In this area, the claimant has mild limitation. The claimant did not make specific allegations in this area. The claimant did not mark on her function report that she had problems getting along with others (Exhibit 4E). The claimant wrote that she got along with authority figures "fine" and denied losing a job due to problems getting along with others. The claimant indicated that she went to her children's schools and social groups on a regular basis. Treatment notes described the claimant as "cooperative" (Exhibit 24F, page 1). The claimant testified that she lives with her husband and two young children she cares for. Treatment notes showed the claimant went on a cruise (Exhibit 15F, page 5).

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. The claimant testified that she has a bachelor's degree, and the claimant has a history of skilled work. The claimant testified that she volunteered for two local boards by attending online meetings. Treatment notes consistently and across providers indicated that the claimant was alert (10/24/2018, Exhibit 6F, page 13; 11/30/2018, Exhibit 6F, page 9; 1/10/2019, Exhibit 11F, page 13; 2/27/2019, Exhibit 8F, page 6; 2/13/2020, Exhibit 16F, page 17; 9/2/2020, Exhibit 27F, page 117). Treatment notes from February 21, 2022, showed that the claimant was writing a book (Exhibit 24F, page 15). The claimant indicated in her function report that her hobbies were reading, writing, watching sports, and going to movies (Exhibit 4E). The claimant indicated that she could manage money such as paying bills. The claimant indicated that she could follow directions "fine." The claimant did not mark that she had difficulties with concentration. The undersigned considered a single treatment note describing the claimant as "slightly distractable" (Exhibit 11F, page 9); however, later treatment notes from this provider described the claimant as demonstrating appropriate concentration (e.g. 8/27/2020, Exhibit 23F, page 23; 4/22/2021, Exhibit 23F, pages 29-30; 9/24/2021, Exhibit 23F, pages 36-37; 4/8/2022, Exhibit 23F, page 44).

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. The claimant did not make specific allegations in this area. The claimant alleged physical problems with selfcare, and stress causing physical problems (Exhibit 4E). The claimant was described as well groomed (e.g. Exhibit 24F, page 1). The claimant is able to care for two young children (e.g. Exhibit 23F, page 19). The claimant manages her own care.

(Tr. 21-22.)

Despite Ms. Young's argument to the contrary, the records she cites do not support a

finding that her mental impairments significantly limit her ability to do basic work activities, or

24

that they are anything more than slight abnormalities that minimally affect her work ability. 20 C.F.R. § 404.1520(c); *Rogers*, 486 F.3d at 243 n.2 (quoting *Higgs*, 880 F.2d at 862). The ALJ explained why these impairments are non-severe and cited the relevant portions of the record. (Tr. 20-22.) Ms. Young advances no discernible argument as to how the ALJ's decision in this regard is not supported by substantial evidence.

To the extent that Ms. Young attempts to rely upon her subjective complaints to support her argument, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Yee v. Kijakazi.*, No. 1:21-CV-02067, 2023 WL 121417, at *8 (N.D. Ohio Jan. 6, 2023) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)). As demonstrated above, the ALJ reasonably and permissibly evaluated the totality of the evidence and determined that the record did not fully substantiate her allegations regarding her mental impairments.

Ms. Young's argument that the ALJ "failed to include any restrictions [in the RFC] related to Plaintiff's depression and anxiety" and to "consider any symptoms related to these problems when forming the RFC" also lacks merit. (ECF No. 5, PageID#1213.) Courts have held that an ALJ need not specifically discuss all non-severe impairments in the RFC assessment when the ALJ makes clear that his decision is controlled by SSR 96-8p. *See, e.g.*, *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851-52 (6th Cir. 2020); *Turner v. Comm'r of Soc. Sec.*, 2021 WL 6275633, at *4 (6th Cir. 2021). Here, the ALJ acknowledged her obligation to comply with SSR 96-8P's mandate to "consider all of the claimant's impairments, including impairments that are not severe." (Tr. 18-19.) And she did so by assessing the opinions regarding Ms. Young's mental health impairments/symptoms. (*See* Tr. 22 ("The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function

analysis."")) Notably, the ALJ found persuasive the state agency opinions of Dr. Johnston (Tr. 87-94) and Dr. Katz (Tr. 96-103), both of whom found that Ms. Young's mental impairments were non-severe and assessed no mental RFC limitations. (Tr. 22-23.) The ALJ also considered Dr. Varkula's opinion that detailed Ms. Young's psychiatric history and symptoms. (Tr. 22; *see* Tr. 19-21, 23.)

Finally, Ms. Young relies, in part, upon her subjective complaints to support her argument. But "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Yee*, 2023 WL 121417, at *8. As demonstrated above, the ALJ considered the record as a whole, including Ms. Young's subjective reports and the medical opinions that were based on her subjective reports, and determined that her impairments were non-severe and warranted no limitations. Accordingly, Ms. Young does not establish that the ALJ did not appropriately consider Ms. Young's mental impairments.

### 2. *The ALJ appropriately evaluated the medical opinions.*

Ms. Young challenges the ALJ's assessment of the opinions from Dr. Parikh, Dr. Schaefer, Dr. Lipold, Dr. Hedaya, Dr. Mehta, the functional capacity evaluations, and the state agency experts. I recommend that the Court reject this assignment of error because Ms. Young fails to establish any error in the ALJ's evaluation of these medical opinions/statements.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is

26

not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

### a.  Dr. Parikh

Ms. Young argues that the ALJ erred in her evaluation of letters Dr. Parikh wrote on Ms. Young's behalf. (ECF No. 5, PageID#1215-16.) But it is unclear precisely what Ms. Young is challenging about these evaluations because she fails to identify any medical opinion upon which the ALJ erroneously evaluated. (*See id.*) Rather, Ms. Young merely summarizes a series of Dr. Parikh's letters that detail Ms. Young's diagnoses, symptoms, and treatment. (*Id.* (citing Tr. 315, 603, 606, 636-45, 655, 774-81, 1185)). The SSA regulations define a medical opinion as a statement from a medical source about what one can do despite her impairments *and* whether one has limitations or restrictions in their abilities. *See* 20 C.F.R. § 404.1545(a)(1). Here, Ms. Young identifies no specific medical opinion of Dr. Parikh that the ALJ erroneously evaluated. *See* 20 C.F.R. § 404.1520c.

Regardless, the ALJ did assess Dr. Parikh's opinions. Ms. Young argues that the ALJ found that Dr. Parikh's letters were unpersuasive "even though Dr. Parikh supported his findings and indicated that any exertion … exacerbated her symptoms." (ECF No. 5, PageID#1216.) This argument is not well-taken because the ALJ assessed Dr. Parikh's statements and concluded that they were not persuasive. (Tr. 31-32.) The ALJ addressed the supportability factor by

acknowledging that the opinions were "not consistent with the treatment record including Dr. Parikh's own treatment notes such as notes from the day before he wrote the letter." (Tr. 32.) Specifically, regarding fatigue, the ALJ acknowledged that Ms. Young reported that she had less energy after the study but also noted that Ms. Young also reported to Dr. Parikh that she exercises regularly. (Tr. 32; *see* Tr. 606.) Dr. Parikh wrote that Ms. Young's general health was otherwise good, and Dr. Parikh's examination revealed Ms. Young had normal gait and was normal and interactive. (Tr. 607.) The ALJ also pointed to another appointment in September 2020 where Dr. Parikh noted that Ms. Young reported fluctuating energy levels but was also exercising regularly. (Tr. 863.) The observational exam described Ms. Young as "alert" and having normal gait. (Tr. 864.) Regarding Ms. Young's vertigo, the ALJ noted Dr. Parikh observed that Ms. Young's vertigo symptoms were described as generally resolved. (Tr. 32; *see* Tr. 606.) Regarding coordination, the ALJ pointed out that Dr. Parikh's treatment notes indicated that Ms. Young had no nystagmus or tremor and non-ataxic movements without dysmetria. (Tr. 607.) The ALJ also noted that the treatment records continually documented normal gait. (Tr. 32.)

Moreover, the ALJ noted that Dr. Parikh's statements "appear in least in part based on [Ms. Young's] subjective reports." (Tr. 32.) Indeed, the ALJ observed that Ms. Young asked Dr. Parikh to add certain statements to Dr. Parikh's letter on September 2, 2020. (Tr. 32; *see* Tr. 855-56.) And the ALJ also observed that Dr. Parikh did not cite to specific objective evidence in support of his September 2020 letter. (Tr. 32; *see* Tr. 850.)

To the extent that Ms. Young argues that the ALJ should have found Dr. Parikh's medical opinions persuasive based on her subjective complaints, she points to no case law establishing such an obligation. *See Yee*, 2023 WL 121417, at *8 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when

28

making a determination of disability."). Here, the ALJ assessed Ms. Young's subjective complaints in light on the entire record and identified substantial evidence supporting her conclusion that Ms. Young's allegations were not fully supported by or consistent with the record overall. Accordingly, Ms. Young does not establish error in the ALJ's evaluation of Dr. Parikh's statements.

### b. Dr. Schaefer

Ms. Young argues that the ALJ erred in her evaluation of Dr. Schaefer's opinion because Dr. Schaefer allegedly opined that Ms. Young "could only be on [her] feet for 10 minutes" and it was unclear how such a limitation "translated as being able to stand/walk for four hours a day." (ECF No. 5, PageID#1217 (citing Tr. 354-55)). This assertion appears to be premised on a misinterpretation of Dr. Schaefer's statements. Dr. Schaefer did not state that Ms. Young could only be on her feet for 10 minutes at a time. Rather, Dr. Schaefer stated that Ms. Young "experienced symptoms if she is on her feet completing a task for greater than 10 minutes." (Tr. 355.) As the Commissioner asserts, a plaintiff's RFC is what the plaintiff is still capable of doing *despite limitations resulting from her physical and mental impairments*. *See* 20 C.F.R. § 404.1545(a)(1). Dr. Schaefer's statements that Ms. Young experiences symptoms after being on her feet for 10 minutes therefore does not establish that Dr. Schaefer opined that Ms. Young could be on her feet for only 10 minutes at a time. *See* 20 C.F.R. § 404.1513(a)(2) ("A medical opinion is a statement form a medical source about what you can still do despite your impairment(s) and whether you have … limitations or restrictions in the following abilities…"). Thus, the ALJ did not err in finding Dr. Schaefer's statements neither inherently valuable nor persuasive.

29

### c. Dr. Lipold[6]

Ms. Young asserts that the ALJ erred when evaluating Dr. Lipold's 2021 statement that Ms. Young's impairments prevent her from engaging in work of any meaningful capacity, "failed to address Plaintiff's ongoing symptoms, including fatigue, symptoms which Dr. Lipold cited as the basis of her opinions." (ECF No. 5, PageID#1218.) This argument is not well-taken.

The SSA regulations provide that a medical source's statements that a plaintiff is unable to work are issues reserved to the Commissioner that are inherently neither valuable or persuasive, and that the ALJ "will not provide any analysis about how [she] considered such evidence …." 20 C.F.R. § 404.1520b(c). In this case, the ALJ appropriately rejected Dr. Lipold's statement that Ms. Young's medical conditions "prevents her from engaging in work of any meaningful capacity and given the progressive nature of her illness, will unlikely be able to do so in the future." (Tr. 649.) This improper statement opined on an issue reserved to the Commissioner.

The ALJ, however, did acknowledge and address the remainder of Dr. Lipold's opinion. Specifically, the ALJ explicitly stated she "did consider Dr. Lipold's statement of the claimant's symptoms." (Tr. 31.) In this case, as discussed in greater detail below, the ALJ acknowledged Ms. Young's symptoms elsewhere in the decision as a part of the analysis of Ms. Young's subjective complaints consistent with 20 C.F.R. § 404.1529 and SSR 16-3p. (*See generally* Tr. 25-35.) Accordingly, Ms. Young establishes no error in the ALJ's evaluation of Dr. Lipold's 2021 opinion.

### d. Dr. Hedaya

Ms. Young argues that a statement of Dr. Hedaya was not a statement on an issue reserved to the Commissioner because "Dr. Hedaya connected her back pain to her underlying

---

[6] Because Ms. Young fails to address how the ALJ erred in evaluating the 2020 medical opinion from Dr. Lipold, this Report and Recommendation will not address this argument.

mitochondrial disorder which established support and consisten[cy] with the remainder of the evidence in this matter." (ECF No. 5, PageID#1219.) This argument is not well-taken.

For context, Dr. Hedaya stated that Ms. Young's condition "is impacted by the rigors and demands of her current position of employment." (Tr. 565.) The ALJ found that, "[t]o the extent" Dr. Hedaya's statement commented on Ms. Young's ability to perform her past relevant work, it was a statement on an issue reserved to the Commissioner. (Tr. 34); *see* 20 C.F.R. § 404.1520b(c). Moreover, regardless of the basis of Dr. Hedaya's opinion, Ms. Young also does not establish that Dr. Hedaya's statements were a medical opinion that the ALJ was required to address. "A medical opinion is a statement from a medical source about ***what you can still do despite your impairment(s)*** and ***whether you have… limitations or restrictions in the following abilities…***" 20 C.F.R. § 404.1513(a)(2) (emphasis added). Ms. Young fails to direct this Court's attention to any statements from Dr. Hedaya's opinion that satisfies these requirements. Accordingly, the ALJ was not required to analyze or review the supportability and consistency of this opinion.

### e. Dr. Mehta

Ms. Young argues that the ALJ erred in her evaluation of Dr. Mehta's opinion because it "detailed [her] symptoms … supported by findings on examination" and because Dr. Mehta's opinion was supported by and consistent with the remainder of the evidence. (ECF No. 5, PageID#1219-20.) This argument is not well-taken.

Here, consistent with the regulations, the ALJ addressed the persuasiveness of Dr. Mehta's opinions. First, the ALJ correctly rejected (Tr. 33) Dr. Mehta's stated that "while Ms. Young desperately wants to work, the fact that she cannot drive for more than 20 minutes without severe pain and the long hours required for marketing in her job makes it impossible for her to return to her position of employment due to her fatigue that is worse when her pain flares. In my medical

31

opinion, she definitely qualifies for long-term disability." (Tr. 371.) Dr. Mehta's statements regarding whether Ms. Young qualified for long-term disability or if she could return to her job are issues reserved to the Commissioner. *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *14 (N.D. Ohio Mar. 18, 2022) ("The pertinent regulations provide that the ALJ is not required to offer 'any analysis' when it comes to issue reserved to the Commissioner, such as whether a person is disabled or not able to work."); *see* 20 C.F.R. § 404.1520b(c)(3).

After discounting Dr. Mehta's improper statements, the ALJ directly addressed Dr. Mehta's opinion that Ms. Young could only drive for more than 20 minutes without severe pain. (Tr. 33-34.) The ALJ addressed the supportability of the opinion and acknowledged that Dr. Mehta supported his opinion by citing to evidence that Ms. Young had bilateral weakness and winging of the left scapula in addition to "mild" weakness of the trunk. (*Id.*; *see* Tr. 937). But the ALJ in addressing the consistency factor also observed that the assessed limitation was not "consistent with the evidence as a whole." (Tr. 34.) Significantly, the ALJ pointed out that Ms. Young reported at a physical therapy appointment that she drove to Florida (Tr. 937.) The ALJ also found persuasive the state agency findings that assessed no such limitation. (Tr. 34.) Despite citing substantial evidence in support of no limitation, the ALJ nonetheless limited Ms. Young to no commercial driving. (Tr. 24, 34.)

Ms. Young argues that Dr. Mehta's opinion was supported by and consistent with the record. (ECF No. 5, PageID#1219-20.) She points to findings that she believes supports this argument. (*Id.* (citing Tr. 370-71).) But the ALJ articulated substantial evidence supporting her conclusion, which was contrary to Ms. Young's preferred conclusion. "[W]hen a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D.

Ohio June 24, 2024) (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). Moreover, Ms. Young does not establish that the ALJ did not comply with the regulations in assessing the supportability and consistency of Dr. Mehta's opinion. 20 C.F.R. § 404.1520c ("The most important factors we consider when we evaluate the persuasiveness of medical opinions…are supportability…and consistency…). Because Ms. Young establishes no error in the ALJ's analysis, I recommend that the Court reject this argument.

### f. Functional Capacity Evaluations

Ms. Young also argues that the ALJ erroneously found that the FCEs were not persuasive "as the State agency reviewing physician's opinions were more consistent with the evidence." (ECF No. 5, PageID#1220.) She argues that the treatment records "as detailed throughout this Argument, and incorporated herein, supported the findings regarding Plaintiff's limitations related to fatigue. Even the ALJ acknowledged that the opinions were supported by citing to weakness and guarded gait." (*Id.* (citing Tr. 30)).

As an initial matter, this argument is waived. In two mere sentences, Ms. Young broadly refers this Court to unspecified records previously discussed somewhere in her merits brief and then asserts that those records supported the FCE findings related to her fatigue. (*See id.*) Ms. Young fails to advance a clear argument as to *how* one would reach this conclusion. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.")

Even if this argument were not waived, it lacks merit because Ms. Young fails to address that the ALJ identified substantial evidence for not finding the opinions resulting from the FCEs

to be persuasive. Specifically, the ALJ observed that, while the FCEs were supported by contemporaneous examinations, they were not consistent with the evidence overall, including the findings of other examinations (Tr. 30; *see* Tr. 315, 603, 606, 637-45, 655, 774-81, 1185) and the state agency findings of Drs. Knierim and Hinzman (Tr. 30.) To the extent that Ms. Young is attempting to challenge the ALJ's evaluation, as will be explained below, such an argument lacks merit because the ALJ properly evaluated the state agency findings and case law permitted the ALJ to rely on those findings. And to the extent that Ms. Young argues that the opinions were supported by her subjective complaints of fatigue, as discussed in more detail below, the ALJ addressed those complaints throughout the decision. Accordingly, Ms. Young's argument lacks merit.

### g.  State Agency Findings

Ms. Young argues that the ALJ erred in the evaluation of the findings from the state agency physicians, Drs. Knierim and Hinzman, because substantial evidence did not support the ALJ's observations about Ms. Young appearing alert and fairly active. (ECF No. 5, PageID#1220-22.) Ms. Young also appears to suggest that that ALJ erred in relying on the state agency findings because of substantial changes in Ms. Young's medical condition after the state agency physicians' reviews of the record (*id.* at PageID#1221) and that the ALJ "failed to acknowledge the objective testing regarding the debilitating and progressive disease." (*id.* at PageID#1221-22.) These arguments are not well-taken.

As an initial matter, Ms. Young's argument that the ALJ erred by relying on the state agency findings merely because the state agency physicians reviewed the record prior to alleged substantial changes in Ms. Young's medical condition is not supported by case law. "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's

report and the ALJ hearing and decision." *Jones v. Colvin*, No. 5:13CV1781, 2014 WL 459812, at
*3 (N.D. Ohio Sept. 12, 2014) (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d
Cir. 2011)). It is proper for the ALJ to rely on the state agency opinions, so long as the ALJ takes
into account subsequent evidence and any relevant changes in the claimant's condition. *McGrew
v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *Brown v. Saul*, No. 1:18-CV-1463,
2019 WL 4039055, at *6 (N.D. Ohio Aug. 27, 2019) ("If an ALJ's decision includes a discussion
of medical opinions or other evidence post-dating the State agency opinions, courts will generally
find no error as the ALJ adequately reviewed the complete case record.") (collecting cases).

Here, there is no error in relying on the state agency findings because, contrary to Ms.
Young's assertion, the ALJ considered medical opinions and other evidence post-dating the state
agency opinions. In this case, Drs. Knierim and Hinzman reviewed the medical record in January
2020 and May 2020. (Tr. 87-94, 96-103.) A plain reading of the ALJ's decision reflects that she
considered medical opinions and medical evidence post-dating these opinions. (Tr. 26-33
(discussing treatment records from 2021 and 2022), 34-35 ("consistent with the record as a whole,
explored in great detail above")).

Ms. Young also fails to establish that substantial evidence does not support the ALJ's
assessment of the state agency findings. Ms. Young contends that the ALJ "failed to acknowledge
the objective testing regarding the debilitating and progressive disease." (ECF No. 5,
PageID#1221.) Here, the ALJ expressly addressed the supportability prong and explained that the
state agency physicians based their opinions on reviews of the record, and they cited to specific
evidence in support of their conclusions. (Tr. 34.) The ALJ also addressed the consistency prong,
stating that "their opinions are consistent with the record as a whole, explored in great detail
above." (Tr. 35.) The ALJ specifically addressed Ms. Young's fatigue and pain and noted that Ms.

Young consistently displayed as "alert" (*see, e.g.*, Tr. 333, 384, 607, 864) with normal gait (*see, e.g.*, Tr. 329, 333, 378) and normal strength (*see, e.g.*, Tr. 329, 333, 361, 603). Thus, Ms. Young fails to establish any error.

### 3. *Substantial evidence supports the ALJ's SSR 16-3p evaluation.*

Ms. Young argues that the ALJ erred in her evaluation of Ms. Young's subjective complaints (ECF No 5, PageID#1222-26), alleging that her statements were consistent with the symptoms she reported to medical professionals (*id.* at PageID#1223-24) and that the ALJ did not explain how her activities of daily living were inconsistent with her allegations (*id.* at PageID#1224). These arguments are not well-taken.

The ALJ is responsible for evaluating a claimant's subjective complaints. *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.3d 918, 920 (6th Cir. 1987); Rogers, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms; and any other factors bearing on the limitations of the claimant to perform basic functions. *Id.*

The ALJ need not analyze all seven factors but should show that they considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

"[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3p, 2017 WL 5180304, at *2.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

As an initial matter, to the extent that Ms. Young attempts to establish the consistency of her allegations merely based on her testimony at the hearing and to providers, this argument fails. A plaintiff's "statements, even if made to medical personnel, are not *per se* credible." *Huse v. Saul*, 2021 WL 863428, at *9 (N.D. Ohio Jan. 6, 2021) (citations omitted), *report and recommendation adopted in part*, 2021 WL 320755 (N.D. Ohio Feb. 1, 2021). Instead, the ALJ must evaluate the claimant's statements in light of the record as a whole.

Here, reading the decision as a whole and with common sense, the ALJ applied the correct legal standard and reached a decision supported by substantial evidence in finding that Ms.

Young's subjective symptom complaints were not supported by the record. *See Blakely*, 581 F.3d at 405. The ALJ first acknowledged her obligations under 20 C.F.R. § 404.1529 and SSR 16-3p in her review of Ms. Young's subjective complaints. (Tr. 24); *see* SSR 16-3p, 2017 WL 5180304, at *7-8. Then, while reviewing the medical and non-medical evidence, the ALJ also reviewed Ms. Young's subjective complaints. (Tr. 24-29.)

In doing so, the ALJ explicitly indicated that the evidence overall did not support the full extent of Ms. Young's complaints. For example, the ALJ discussed the objective evidence in demonstrating why Ms. Young's allegations of symptoms of pain and fatigue were not supported by the overall record. See 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms…"). Notably, Ms. Young consistently presented as "alert." (Tr. 27; *see* Tr. 329, 333, 361, 385, 607, 864.) And later in the ALJ's SSR 16-3p analysis, the ALJ even discussed how Ms. Young responded to conservative treatment included physical therapy and experimental drugs. (Tr. 27-28.) Significantly, Ms. Young reported on February 23, 2022, that she experienced less fatigue with standing and walking activities like cooking in the kitchen or walking around the store shopping. (Tr. 1009.) The ALJ observed that the physical therapy notes demonstrated that Ms. Young responded well to her experimental treatment, reporting on February 28, 2022, that she had significant improvements overall since beginning Neubie treatment and indicating that she noticed she could work out a little harder and tolerate activities of daily living with less difficulty. (Tr. 1007.)

The ALJ also considered Ms. Young's daily activities in assessing her subjective complaints regarding fatigue. *See* 20 C.F.R. § 404.1529(c)(3)(1); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a

38

claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). The ALJ acknowledged that Ms. Young reported fatigue but noted that "the record showed [Ms. Young] was fairly active and functional." (Tr. 26.) Indeed, the ALJ highlighted reported activities from the treatment records that were inconsistent with her alleged degree of limitations. For example, the ALJ observed that Ms. Young reported having gone on a cruise over the holiday season and developing some pain in her left lower back and hip by the end of the trip. (Tr. 583.) In February 2020, despite her reports of fluctuating energy levels, she reported exercising regularly. (Tr. 606.) Notably, despite her hearing testimony that she could be a passenger but not a driver (*see* Tr. 73), she reported in January 2021 that she drove to Florida. (Tr. 925, 937.) She even reported the following month that she took a skiing trip. (Tr. 927.) She also reported in February 2022 that she was writing a book. (Tr. 718.)

I recognize that Ms. Young has testified that she experiences severe fatigue. (*See* Tr. 58-59, 64.) But as the ALJ concluded, Ms. Young's reported activities of daily living indicate that she "was fairly active and functional" despite her subjective reports regarding fatigue. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241. Here, Ms. Young does not establish how a reasonable mind would not conclude that her fatigue allegations are inconsistent with her reported activities of attending a cruise over the holiday season, exercising regularly, driving to Florida, and skiing. Thus, the ALJ's consideration of the inconsistencies between such activities and her allegations of disabling symptoms, particularly extreme fatigue, is appropriate and supported by substantial evidence. 20 C.F.R. § 404.1529(c)(3)(i) (stating that one's daily activities are factors relevant to an ALJ's assessment of a claimant's symptoms).

In raising a challenge to the ALJ's evaluation of fatigue, Ms. Young attempts to connect her testimony regarding fatigue to her other subjective complaints involving different issues such as weakness in her trunk, back, walking and standing, dizziness, ptosis, and dexterity in her hands. (*See* ECF No. 5, PageID#1223.) Yet, she does not establish—nor did she testify at the administrative hearing—that these alleged limitations were related to her fatigue. (*See generally* Tr. 59-63, 73-77.) Regardless, the ALJ here explicitly addressed Ms. Young's other complaints as well and demonstrated why they were inconsistent by assessing the record as a whole. (Tr. 27-29.) Ms. Young does not directly confront any of the ALJ's reasoning for discounting her subjective complaints regarding these issues. (*See* ECF No. 5, PageID#1222-26.)

Ms. Young's disagreement with how the ALJ weighed the evidence does not establish a lack of substantial evidence supporting the ALJ's analysis. That is because "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It is not the role of a reviewing court "to reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 6th Cir. 2011) (citing *Youghioheny & Ohio Coal Co. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). Thus, Ms. Young presents no compelling reason to disturb the ALJ's SSR 16-3p analysis. *Baumhower*, 2019 WL 1282105, at *2.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: June 18, 2024                                    /s/ *Jennifer Dowdell Armstrong*
                                                       Jennifer Dowdell Armstrong
                                                       U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate

the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).